IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                        No. CR 12-0944 RB

SOPHIA MONIQUE ZAYAS,

    Defendant.

## MEMORANDUM OPINION AND ORDER

On August 4, 2021, a jury found Defendant Sophia Zayas guilty of one count of Second-Degree Murder, one count of Intentional Child Abuse Resulting in Death, four counts of Intentional Child Abuse Resulting in Great Bodily Harm, and two counts of Intentional Child Abuse Not Resulting in Great Bodily Harm. Ms. Zayas now moves for a judgment of acquittal, or alternatively, for a new trial. (Doc. 452.) Having considered the record and the arguments of the parties, the Court will deny the motion.

**I.    Background**

The Court conducted a jury trial in this matter from July 26 through August 4, 2021, on the following counts:

Count 1: Second-Degree Murder in violation of 18 U.S.C. §§ 7, 1111, 3559(f)(1), and 18 U.S.C. § 2.

Count 2: Intentional Child Abuse Resulting in Death in violation of 18 U.S.C. §§ 7 and 13, N.M. Stat. Ann. §§ 30-6-1(D)(1)–(2) and (H), and 18 U.S.C. § 2, or as an alternative to Count 2,

Count 3: Reckless Child Abuse Resulting in Death in violation of 18 U.S.C. §§ 7 and 13, N.M. Stat. Ann. §§ 30-6-1(D)(1)–(2) and (F), and 18 U.S.C. § 2.

Counts 4, 6, 8, 10: Intentional Child Abuse Resulting in Great Bodily Harm in violation of 18 U.S.C. §§ 7 and 13, N.M. Stat. Ann. §§ 30-6-1(D)(1)–(2) and (E), and 18 U.S.C. § 2, or as an alternative to these counts,

Counts 5, 7, 9, 11: Reckless Child Abuse Resulting in Great Bodily Harm in violation of 18 U.S.C. §§ 7 and 13, N.M. Stat. Ann. §§ 30-6-1(D)(1)–(2) and (E), and 18 U.S.C. § 2.

Counts 12, 14: Intentional Child Abuse Not Resulting in Great Bodily Harm in violation of 18 U.S.C. §§ 7 and 13, N.M. Stat. Ann. §§ 30-6-1(D)(1)–(2) and (E), and 18 U.S.C. § 2, or as an alternative to these counts,

Counts 13, 15: Reckless Child Abuse Not Resulting in Great Bodily Harm in violation of 18 U.S.C. §§ 7 and 13, N.M. Stat. Ann. §§ 30-6-1(D)(1)–(2) and (E), and 18 U.S.C. § 2.

Count 16: Reckless Child Abuse of Jane Doe #2 in violation of 18 U.S.C. §§ 7 and 13, N.M. Stat. Ann. §§ 30-6-1(D)(1) and (E), and 18 U.S.C. § 2.

(*See* Docs. 335; 437.)

Following the presentation of the Government's case, Ms. Zayas moved for a judgment of acquittal. The Court granted the motion as to Count 16 and denied it as to the remaining counts. (*See* Doc. 451.) At the end of the trial, the jury found Ms. Zayas guilty of Counts 1, 2, 4, 6, 8, 10, 12, and 14. (Doc. 449.) Ms. Zayas now moves for a judgment of acquittal pursuant to Rule 29 and argues that the Government's evidence is insufficient to support any of the counts. (*See* Doc. 452.) She also asks for a new trial under Rule 33. (*See id.*) The Government opposes the motion. (*See* Doc. 460.) Ms. Zayas did not file a reply brief.

## II.     Legal Standard

Federal Rule of Criminal Procedure 29(a) provides that the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Where a defendant challenges the sufficiency of the evidence after a guilty verdict, the Court considers "whether taking the evidence, both direct and circumstantial, together with the reasonable inferences to be drawn therefrom, in the light most favorable to the government, a rational finder of fact could reasonably have found the defendant guilty of the crime charged beyond a reasonable doubt." *United States v. Rodriguez-Flores*, No. CR 16-580 RB, 2016 WL 9777486, at *1 (D.N.M. Sept. 27, 2016), *aff'd*, 907 F.3d 1309 (10th Cir. 2018) (citing *United States v. Burkley*, 513 F.3d 1183, 1188, 1190 (10th Cir. 2008); *United States v. Chavez-Palacios*, 30 F.3d 1290, 1293–94 (10th Cir. 1994); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"In conducting this inquiry, the court may neither assess witness credibility nor weigh the evidence presented to the jury." *Id.* at *2 (citing *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004); *United States v. Avery*, 295 F.3d 1158, 1177 (10th Cir. 2002)). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities, except guilt." *Id.* (citing *United States v. Serrata*, 425 F.3d 886 (10th Cir. 2005)). While "a conviction cannot be sustained by 'piling inference on inference[,]'" *id.* (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 2012)), a jury may "make reasonable inferences based on the evidence presented at trial[,]" *id.* (citing *Jackson*, 44 U.S. at 319).

Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Civ. P. 33(a). "A motion for a new trial is not regarded with favor and is only issued with great caution." *Rodriguez-Flores*, 2016

WL 9777486, at *2 (quoting *United States v. Herrera*, 481 F.3d 1266, 1269–70 (10th Cir. 2007)). "The decision whether to grant a motion for a new trial is committed to the sound discretion of the trial court." *Id.* (citing *United States v. Stevens*, 978 F.2d 565, 570 (10th Cir. 1992)).

**III.     Analysis under Rule 29**

Ms. Zayas argues that the evidence is insufficient to sustain her convictions on all counts.

**A.     Counts 1 and 2: Second-Degree Murder and Intentional Child Abuse Resulting in Death**

The medical experts agreed that Ms. Zayas's daughter, Annalicia, died as the result of an axonal injury in her brain. (*See* Doc. 452 at 5.) Ms. Zayas argues that "[t]here was a factual dispute as to what caused the axonal injury" and disagrees that the medical evidence showed "that the injuries discovered caused" Annalicia's death. (*Id.* at 4–5.) She raises several issues in support of her position.

Ms. Zayas first asserts that the Government's two medical experts, Drs. Aurelius and Martin, offered conflicting testimony regarding the cause of the axonal injury. (*Id.*) She contends that Dr. Aurelius testified that "the axonal injury was a result of acceleration[-]deceleration injury (commonly known as 'shaken baby syndrome'), despite the fact that there were no other indicators of that type of injury." (*Id.*) The Government responds that Ms. Zayas has taken "a myopic view of" this testimony. (Doc. 460 at 4.) Dr. Aurelius testified that an "acceleration-deceleration injury" not only encompasses injuries resulting from shaking a baby, but also includes injuries due to shaking that occurs with an impact. (*See id.* (citing Doc. 446 at 161).) In other words, an acceleration-deceleration injury can occur when "a child is moved forward" and their head "impact[s] an object, and then the brain, itself, moves in and out from that impact." (Doc. 446 at 87.)

4

Ms. Zayas asserts that Dr. Aurelius's testimony is contradicted by the Government's rebuttal expert, Dr. Martin, who "opin[ed] that the axonal injury was caused by blows to the head." (Doc. 452 at 5.) The Government contends, though, that Drs. Aurelius and Martin agreed that Annalicia's "traumatic diffuse axonal injury was caused by head trauma." (Doc. 460 at 5.) Dr. Aurelius testified that Annalicia "died of multiple blunt force injuries," both to her head and her ribs. (*Id.* at 91, 103.) Dr. Martin testified that she believed Annalicia died from traumatic diffuse axonal injury due to blunt force trauma to the head as evidenced by multiple impact sites.[1] (Doc. 459 at 43–44.)

Ms. Zayas next avers that Dr. Aurelius believed Annalicia's axonal injury was caused by an acceleration-deceleration event, "despite the fact that there were no other indicators of that type of injury." (Doc. 452 at 5.) While Ms. Zayas does not specify what "indicators" of shaken baby syndrome were not present (*see id.*), Ms. Zayas's counsel cross-examined Dr. Aurelius extensively on retinal hemorrhage, subdural hemorrhage, and subarachnoid hemorrhage, which are often cited as three things to look for besides axonal injury in shaken baby syndrome. (*See* Doc. 446 at 160–64.) As Dr. Aurelius testified, though, these three indicators may be common, but they are not required. (*See id.* at 164.) Dr. Martin, the Government's rebuttal witness, agreed that the absence of these indicators does not rule out traumatic diffuse axonal injury. (Doc. 459 at 20–21, 47–48.) Moreover, medical examiners look for other indicators of acceleration-deceleration events that *were* present here, such as a deep scalp hemorrhage and impact sites. (Doc. 446 at 160, 163–64.) Thus, the Court disagrees with Ms. Zayas's characterization of Dr. Aurelius's testimony.

---

[1] Dr. Martin acknowledged that while Annalicia did not exhibit the classic features of a shaken baby, it was possible that Annalicia's injury was due to an acceleration-deceleration event. (*See* Doc. 459 at 43–47.) Dr. Martin stated that Annalicia could have been hit in the head multiple times in succession, causing an acceleration-deceleration event. (*Id.* at 47.)

Finally, Ms. Zayas asserts that Dr. Martin premised her opinion on a mistaken belief—that Annalicia's skull fractures occurred the day Annalicia died, while the examining experts "believed those fractures were in the process of healing" and could not have occurred on the day she died. (Doc. 452 at 5.) In the face of this alleged contradictory testimony, Ms. Zayas asserts that her own expert, Dr. Wilson, "gave an extremely reasonable alternative explanation" for the axonal injury that did not involve trauma to Annalicia's head. (*Id.*) She argues that the Government's evidence does not rise to a "level of proof . . . beyond a reasonable doubt." (*Id.*) The Government points out that "Dr. Martin testified *one* of the skull fractures occurred on the day of Annalicia's death." (Doc. 460 at 5 n.2 (citing Doc. 459 at 57, 105).) Dr. Martin based her opinion on a second autopsy performed after Dr. Aurelius's autopsy. (*See* Doc 459 at 104–05.) The second autopsy found that one of the fractures was healing and one was acute, meaning that it happened closer in time to Annalicia's death. (*See id.* at 105.) Dr. Aurelius, who originally testified that both fractures were weeks old, later refreshed her recollection and said that one of the fractures was "days to weeks old." (*See* Doc. 460 at 5 n.2 (citation omitted); *see also* Doc. 446 at 82, 85 (testifying that skull fractures were "weeks to months old"), 90 (after refreshing her memory, testifying that skull fractures were "days to weeks old").) Thus, the difference in opinion on timing was not as extreme as Ms. Zayas maintains.

Viewing the evidence and drawing all reasonable inferences in a light most favorable to the Government, the Court finds that Drs. Aurelius's and Martin's testimony provides sufficient evidence for the jury to find that Ms. Zayas's intentional conduct caused Annalicia's death. Both physicians testified that Annalicia's injuries stemmed from multiple blunt force trauma that was the result of abusive behavior. (*See* Docs. 446 at 174, 177, 182; 459 at 44, 55–56, 97–98.) Ms. Zayas's attempt to offer Dr. Wilson's testimony as a "reasonable alternative explanation that did

not include trauma to the head" (Doc. 452 at 5) is irrelevant to this analysis, as the Court need not weigh conflicting evidence under the Rule 29 standard. *See United States v. White*, 673 F.2d 299, 301–02 (10th Cir. 1982). Further, as the Government notes, Dr. Wilson admitted that hemorrhaging found in Annalicia's spinal cord could indicate a whiplash or acceleration event. (Doc. 458 at 97–98.) The Court will deny Ms. Zayas's motion on this issue.

        **B.**         **Counts 2, 4, 6, 8, 10, 12, 14: Intentional Child Abuse**

Ms. Zayas next asserts that for purposes of Counts 2, 4, 6, 8, 10, 12, and 14, the Government theorized "that Ms. Zayas prioritized alcohol over her children, and somehow caused injuries to Annalicia." (Doc. 452 at 6.) She argues that "there is not a scintilla of evidence that Ms. Zayas ever acted with the conscious objective to hurt Annalicia." (*Id.*) She avers that there was no "testimony from any individual, [including] Peter Zayas[,] that stated that Sophia Zayas committed or intended to commit an act that had at its base a 'conscious objective to achieve a result'—[to] endanger or harm Annalicia." (*Id.*)

Yet, the Government is not required to present testimony from a witness who saw Ms. Zayas abuse Annalicia or heard her state an intent to hurt her daughter. "Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *New Mexico v. Montoya*, 345 P.3d 1056, 1070 (N.M. 2015) (quotation omitted). In *Kriesel v. Bowen*, for example, the plaintiff was convicted of intentional child abuse under N.M. Stat. Ann. § 30-6-1-(D). No. 19-CV-0992 KG/SMV, 2020 WL 4050376, at *1 (D.N.M. July 20, 2020), *R&R adopted*, 2021 WL 1720903 (D.N.M. Apr. 30, 2021). He later filed a Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus and argued that there was a "lack of direct evidence linking him to the injuries . . . ." *Id.* at *5. The court found, though, that the circumstantial evidence was sufficient to support the conviction. *Id.* The circumstantial evidence in *Kriesel* included, in part,

testimony that the plaintiff was the child's caretaker at the time of the injury and that the hypothetical explanations offered for the child's injuries were inadequate. *Id.*

Here, all three medical experts, including Ms. Zayas's, agreed that many of Annalicia's injuries were consistent with abusive conduct. (*See* Docs. 446 at 174, 177, 182; 458 at 20, 38, 84; 459 at 44, 55–56, 97–98.) As the Government notes, "the more pressing issue for the jury was not whether Annalicia was the victim of intentional child abuse but instead who inflicted the injuries." (Doc. 460 at 6.) The jury heard testimony that there were three adults present in the home: Peter Zayas, Sophia Zayas, and Marva Reid. (*See, e.g.*, Doc. 437 at 27.) Peter Zayas denied he abused Annalicia and averred that his previous "confessions" were lies and attempts to protect Ms. Zayas. (*See, e.g., id.* at 29–30.) He further testified that he asked Marva Reid to help the family because he was concerned about Ms. Zayas's ability to care for the children while drinking. (*See id.* at 27.)

Peter Zayas testified that Ms. Zayas was Annalicia's primary caretaker and that she cared for Annalicia on the day that she died. (*See, e.g., id.* at 27, 30, 32.) He further stated that Ms. Zayas was coming out of a period of binge drinking on the day Annalicia died and that she was dangerous when she was drinking. (*See id.* at 27, 31.) This is relevant where Dr. Martin testified that Annalicia likely sustained her trauma close in time to her death. (*See, e.g.*, Doc. 459 at 104–05; *see also* Doc. 446 at 85.)

FBI Agent Lilli McDowell-Schnell, who interviewed the Zayases several times after Annalicia's death, testified that Ms. Zayas contradicted herself when recounting details of the day. (*See* Doc. 437 at 35.) The jury heard testimony that the lack of a plausible explanation for the type of injuries Annalicia sustained "equals abuse because people want to keep the abuse hidden." (Doc. 458 at 26; *see also* Doc. 460 at 7.)

Ultimately, the jury heard testimony that Ms. Zayas had a serious drinking problem, that

she was the only person to care for Annalicia on the day of Annalicia's death, that Annalicia's injuries were consistent with abusive conduct, and that Peter Zayas disavowed responsibility for Annalicia's death. Moreover, the medical evidence showed that this baby suffered numerous abusive incidents in her very short life. Viewing this evidence in the light most favorable to the Government without weighing the credibility of the witnesses, *see White*, 673 F.2d at 301–02, the Court finds that there is sufficient evidence to establish that Ms. Zayas intentionally harmed Annalicia.

### C.   Counts 12 and 14: Circular Lesions

Finally, Ms. Zayas contends that there is insufficient evidence to find beyond a reasonable doubt that the round lesions on Annalicia were cigarette burns. (Doc. 452 at 6–7.) She argues that "[t]he only witness (Dr. Aurelius) who saw those lesions clarified that she could not say what they were, but that they were 'suggestive' of cigarette burns." (*Id.* at 6.) She complains that Dr. Aurelius did not perform tests to confirm whether the lesions were cigarette burns. (*Id.*) And while Dr. Martin agreed that they could be cigarette burns, Dr. Wilson did not believe they were. (*Id.* at 6–7.)

The Government responds that the "lesions were not charged as cigarette burns, . . . [but] as circular lesions." (Doc. 460 at 9.) Count 12 charged that Ms. Zayas "did intentionally, and without justifiable cause, cause [Annalicia], a child, to be placed in a situation that may endanger [Annalicia's] life and health, and to be tortured and to be cruelly punished, which resulted in harm to [Annalicia], to wit: older circular lesions." (Doc. 336 at 7.) Count 14 charged Ms. Zayas with the same conduct with respect to "newer circular lesions." (*Id.* at 8.)

Dr. Martin testified that lesions or "abrasions are uncommon in young infants" and should have an explanation. (Doc. 459 at 40–41; *see also* Doc. 460 at 9.) No adequate explanation was

9

ever provided. And because Annalicia was too young (at two months) to cause the injuries herself, the Government argues that the lesions "represented inflicted injuries on Annalicia's body." (Doc. 460 at 9; *see also* Doc. 437 at 38.) Three physicians—Drs. Aurelius, Martin, and Campbell—testified that the lesions were suggestive of cigarette burns.[2] (*See* Doc. 437 at 38; 446 at 62; 459 at 39.) Dr. Aurelius testified that the lesions "fit with injury from cigarette burns" due to their pattern (i.e., they were "linear and all in a row") and their size. (Doc. 446 at 62.) Dr. Martin testified that at least one of the lesions on Annalicia's body had the "classic appearance" of a cigarette burn in terms of size ("approximately a centimeter in diameter") and characteristics (with "the burn in the middle [being] deeper" because "the middle of a cigarette is hotter"). (Doc. 459 at 8–9.) Finally, Peter Zayas testified that Ms. Zayas smoked cigarettes in the house. (Doc. 437 at 27.)

Again, viewing the evidence in a light most favorable to the Government, the Court finds there is sufficient evidence for the jury to find Ms. Zayas guilty on both counts regarding the circular lesions. The Court disagrees that the evidence suggests that the lesions were "maybe" cigarette burns, as Ms. Zayas argues. Instead, the jury was justified in finding that the lesions were indicative of intentional child abuse. The Court will deny Ms. Zayas's motion for a judgment of acquittal on all issues.

## IV. Analysis under Rule 33

Ms. Zayas offers two reasons to grant her alternative request for a new trial: first, on the basis that "the verdicts are against the great weight of the evidence"; and second, because of alleged unfairness in the manner Dr. Wilson's testimony was presented. (*See* Doc. 452 at 7–8.) As

---

[2] The Court declines to accept Ms. Zayas's invitation to consider Dr. Wilson's testimony on this issue. (*See* Doc. 452 at 6–7.) *See also White*, 673 F.2d at 301–02 (under the Rule 29 standard, a court "must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, [to] determine whether that evidence, if believed, would establish each element of the crime") (citations omitted).

the Court has already found that the evidence is sufficient to sustain the convictions, it will deny the motion on the first ground.

At the conclusion of Ms. Zayas's direct examination of Dr. Wilson, Dr. Wilson opined that several features of Annalicia's death led him to conclude that her death could have been the result of SIDS. (Doc. 458 at 59 (opining that "one of the autopsy findings of SIDS was present in this baby . . . . And so one doesn't want to use SIDS in the setting where a baby's been abused, but this could also be a SIDS death . . . .").) This opinion contradicted assertions that Ms. Zayas's counsel (Mary Stillinger) made to the Court that morning. (*See id.* at 61 ("Ms. Stillinger, I understood you to say this morning that the doctor was going to absolutely disavow SIDS and he was not going to opine it was a SIDS death.").) It also contradicted representations Dr. Wilson made to the Government's counsel (Maria Armijo) the previous day. (*Id.* at 60–61 ("Dr. Wilson . . . specifically said that he would call this death a homicide.").)

Ms. Stillinger explained that Dr. Wilson's surprise testimony may have been due to a new opinion he'd formed while reviewing the evidence for trial the previous weekend. (*Id.* at 64.) After reviewing the evidence, he opined that Annalicia's rib fractures could have bruised her lungs, causing blood to enter her lungs, which contributed to her death. (*See id.*) The Government's attorneys objected to the new theory because they would not have time to present it to their own experts. (*See id.*) The parties agreed that Dr. Wilson would not testify about his new theory. (*See* Doc. 460 at 11.)

Once Dr. Wilson opined that the cause of death could be SIDS, Ms. Armijo sought to question him about their conversation from the day before, in which he shared his new theory and agreed that Annalicia's death was a homicide. (*See* Doc. 458 at 61, 65–70.) Ms. Stillinger argued that if the Government was allowed to question Dr. Wilson about his opinion that the death was

11

due to homicide, then she wanted to ask him about his opinion regarding the blood in Annalicia's lungs. (*Id.* at 72.) The Court agreed with Ms. Stillinger and allowed the parties to pursue the proposed lines of questioning. (*Id.* at 72–74.)

On cross-examination, Ms. Armijo explored Dr. Wilson's opinions regarding whether he believed Annalicia's death should be classified as a homicide or as SIDS. (*See id.* at 77–78.) When Dr. Wilson responded that he had been prevented from testifying about his new lung damage theory, Ms. Armijo noted that he "appeared to be a little upset in accusing me of preventing . . . [him from] testifying about something." (*Id.* at 78–79.) Ms. Armijo then pressed Dr. Wilson on his change in theory. (*See id.* at 79–80.) Ms. Zayas argues that Ms. Armijo "attacked [Dr. Wilson] and managed to mischaracterize his testimony, so that it appeared that he was changing his opinion." (Doc. 452 at 8.) Yet, this is precisely the situation the Court and the parties were confronted with. Dr. Wilson changed his opinion from what he represented he would testify to the previous day. Ms. Stillinger was able to address the circumstances on re-direct. (*See* Doc. 458 at 121–23.) The Court disagrees that Ms. Armijo "prevent[ed] the defense from adducing evidence that she could later adduce." (Doc. 452 at 8.)

In short, the Court does not find that the Government's counsel acted inappropriately or that the cross-examination of Dr. Wilson was so prejudicial that the interest of justice requires a new trial.

**THEREFORE,**

**IT IS ORDERED** that Ms. Zayas's Motion for Judgment of Acquittal, or, in the Alternative, Motion for New Trial (Doc. 452) is **DENIED;**

**IT IS FURTHER ORDERED** that Ms. Zayas's Motion in Limine to Exclude Certain Exhibits (Doc. 344) and the United States' Motion in Limine Regarding Peter Zayas' Prior Statements (Doc. 339) are **DENIED AS MOOT.**

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE